The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Andrew Thorpe STATON,
Defendant–Appellee.

No. 96SA113.

Supreme Court of Colorado,
En Banc.

Sept. 23, 1996.

Peter F. Michaelson, District Attorney, Fifth Judicial District, Jeffrey S. Ryan, Deputy District Attorney, Breckenridge, for Plaintiff–Appellant.

David F. Vela, Colorado State Public Defender, Frances Smylie Brown, Chief Appellate Deputy, Denver, for Defendant–Appellee.

MULLARKEY, Justice.

The People bring this interlocutory appeal under C.A.R. 4.1 to challenge the trial court's suppression of evidence seized pursuant to an automobile search warrant issued in North Carolina. The defendant-appellee, Andrew Thorpe Staton (Staton), was charged with one count of first degree felony murder, section 18–3–102(1)(b), 8B C.R.S. (1986), and one count of first degree murder after deliberation, section 18–3–102(1)(a), 8B C.R.S. (1995 Supp.). Staton moved to suppress all evidence obtained from the automobile search based on the insufficiency of the search warrant and supporting affidavit.[1] The trial court granted the motion holding that the warrant failed to meet the Fourth Amendment's particularity requirement. We hold that: (1) the warrant's defects were cured by the supporting affidavit which was incorporated by reference into the warrant; (2) under the particular circumstances presented here, the validity of the search did not depend upon whether the curative affidavit accompanied the warrant at the time the search was executed; and (3) the supporting affidavit stated with sufficient particularity the property to be seized. Accordingly, we reverse the trial court's order suppressing the evidence seized from Staton's automobile.

## I.

The statement of facts which follows is taken from the affidavit in support of the search warrant and from the trial court's findings of fact in the suppression hearing.

On the morning of March 25, 1995, Janice and Ron Drake discovered a body at the northeast corner of the intersection of West LaBonte and West Buffalo Streets in Dillon, Colorado. Janice Drake immediately contacted the Dillon police and Officers Joan Boss and Wendy Kipple responded to her call. There, Officer Kipple found identification on the body (a "Ski the Summit" photo identification pass) indicating that the deceased was John Hickok. Officer Kipple observed pools of blood on the roadway next to the body and a six inch rock, covered with blood, nearby. Officer Kipple further ob-

---

1. The motion to suppress identified the following items as having been seized pursuant to the automobile search:

    Hair samples, two white tee shirts, another tee shirt, a sock, a blue and red comforter, a mattress pad, a bed sheet, two pillow cases, two pairs of blue jeans, a brown jacket, a white towel, a blue and tan bag, a plastic bag, a newspaper, a bag containing marijuana [sic] drug paraphernalia and a film canister.

served drag marks leading from an adjacent undeveloped lot to the area where the body and bloody rock were located. Based on the autopsy, Dr. Ben Galloway testified that Hickok died from a trauma caused by a blunt instrument.

Later on that day, Luis A. Segura brought a blue fanny pack to the Dillon Police found by him at the intersection where Hickok's body was discovered. The fanny pack contained a pair of gloves, a flashlight, and several empty plastic bags. Segura told the police that he believed the gloves were soaked in blood or possibly paint.[2] Later, the police learned that Hickok typically carried his money in plastic bags inside a blue fanny pack.

Gerald D. Sandberg (Sandberg), an investigator with the Office of the District Attorney, Fifth Judicial District of the State of Colorado, and Susan Kitchen, an agent with the Colorado Bureau of Investigation, learned that Hickok had spent the early morning hours from 12:30 a.m. to 2:00 a.m. at a drinking establishment in Dillon, known as "Alice's," playing pool. There, witnesses noted that Hickok had a substantial amount of cash on his person. According to the supporting affidavit, Hickok's mother had sent him $1,000 for a trip to Yellowstone National Park. No money was found on the deceased.

Witnesses told Sandberg that Hickok left Alice's with an individual identified as "Drew." Sandberg also learned that someone, known as "Andrew," had caught a ride hitchhiking early on March 25, 1995, and had been dropped off at his trailer in the Cottonwood Trailer Park in Silverthorne, Colorado.[3] The hitchhiker had blood on his hands and a cut on his finger bandaged with a t-shirt. The two men who had picked him up noted that the hitchhiker had a number of folded twenty dollar bills in his shirt pocket and later identified "Andrew," from a photograph, as Staton. Consequently, Sandberg's investigation focused on Staton.

Upon further investigation of Staton, Sandberg ascertained that on March 26, 1995, Staton purchased a green 1975 Chevrolet van from a woman in Breckenridge. Staton told the woman he would be taking the van to North Carolina to take care of some "business." Upon questioning, Staton's roommates told Sandberg that Staton had left town instructing them to tell anyone who asked of his whereabouts that he had gone to California, but that in actuality, he was going "back East." Sandberg also learned that Staton had been employed at the Sunshine Cafe in Silverthorne but left without retrieving his last pay check.

Sandberg went to North Carolina and, after interviewing Staton at his attorney's office, arrested him. During the course of the interview, Staton told Sandberg that he purchased the green van, drove it to North Carolina, and that most of his belongings were still in the van.

Thereafter, Sandberg, with the assistance of the local authorities, in particular, Detective Dennis P. Pridgen (Pridgen) of the Wilmington Police Department, applied for a search warrant for the van, then located in Wilmington, North Carolina. In essence, the supporting affidavit stated that the evidence sought was clothing items containing traces of blood. The application was approved on April 6, 1995, by Superior Court Judge Ernest B. Fullwood sitting in New Hanover County, North Carolina. The search, conducted that same day, led to the seizure of approximately eighteen items of property including clothing, three hair samples, a blue and tan bag, a plastic bag containing a newspaper, contraband (marijuana, drug paraphernalia), and bedding (mattress pad, bed sheets, and pillow cases).

Staton was charged with one count of felony murder and one count of murder after deliberation. The People gave notice of intent to seek the death penalty. On August 14, 1995, Staton filed a motion to suppress evidence resulting from the North Carolina search warrant.[4] The motion was premised

---

2. Exactly what he said is unclear and disputed.

3. It was later established that Staton lived in the Cottonwood Trailer Park.

4. The motion requested suppression of:
   [A]ll evidence seized by police in this matter, all observations made by police, all identifications of [Staton] by any witness in this case, and all statements made by [Staton] to police

on the following grounds: (1) the warrant was based on false and inaccurate information; (2) without the false information there was no probable cause to support the warrant; (3) the warrant and attached affidavit were nonspecific and general; and (4) the seizure of the evidence was unreasonable, overbroad, and constituted an impermissible exploratory search.

The suppression hearing was conducted on November 13, 1995, November 15, 1995, December 14, 1995, and March 13, 1996, some months after the search of the van. Both Sandberg and Pridgen testified at the hearing.[5] Sandberg testified on the logistics of the search which was conducted under his supervision. Specifically, Sandberg explained that he directly supervised the search, instructing the officers who were assisting him to seize certain items. During his testimony, Sandberg was questioned about every item he directed to be seized. However, he was unable to recollect if all of the items seized had traces of blood. His answers generally indicated that since blood stains are not readily detectible to the naked eye, he seized all of the clothing, as well as the bedding and the bag.[6] Sandberg also seized evidence other than clothing and bedding that he perceived would be material in a subsequent prosecution. Sandberg seized three hair samples, two that he found on t-shirts and one found on a sock. While none of these three clothing items contained blood traces, Sandberg seized these items because he knew that Hickok died by a blow to the head and thought there might have been a transfer of hair and blood during the murder.[7] He seized a copy of the *Summit Daily Journal*, a Summit County newspaper, which contained an article about the homicide be-

cause it linked Staton to the area during the time in question. He also seized contraband.

The trial court found that, pursuant to the warrant and supporting affidavit, there was probable cause to believe that a crime had been committed, that Staton was the perpetrator, and that there would be evidence of the crime found in Staton's van. Nevertheless, the trial court granted Staton's motion to suppress, finding that:

> The warrant fails to state with any particularity property to be searched for, seized or inspected, and the nonspecific reference to blood traces contained in the Affidavit itself is insufficient to cure that defect and provide the type of direction to one conducting a search, which is not only constitutionally required, but required pursuant to Rule 41 and 16–3–301.

In so holding, the trial court ruled that it was bound by the "four corners of the search warrant." The trial court particularly noted Sandberg's testimony and ruled as follows:

> [Sandberg's] testimony reflects clearly that he was unable to state with particularity the observation of any type of stain which he believed might be blood. He further testified that he took some of these items for other investigatory purposes than just to determine if they contained blood. The Court would note that his testimony disclosed and the application for the Search Warrant indicates that he has twelve years of law enforcement experience, having attended 10 to 20 homicide investigation classes and schools and approximately four classes in blood evidence. If he's done that and he can't say whether he believes or thinks that something might have blood on it, then that representation would be a

as well as the statements of any other witness in this case which resulted from the search warrant issued in this case.

5. Pridgen's testimony is largely irrelevant here. Although present during the search of Staton's van and a co-affiant on the affidavit supporting the warrant application, Pridgen's role was secondary to that of Sandberg.

6. Of the clothing items seized by Sandberg, two brown jackets were the cause of much concern during the suppression hearing. Staton was al-

legedly seen wearing a brown jacket during the morning in question and, consequently, Sandberg testified that he seized both brown jackets recovered in the van. One of the brown jackets, the leather jacket, evinced "smears" of unknown origin. As to the other, a canvas "Carhart" jacket, Sandberg testified that although he did not notice any stains, he could not conclusively rule out the possibility of blood stains.

7. Upon further questioning, Sandberg added that there may well have been blood traces on the hair samples but he could not be certain.

misrepresentation of his knowledge to the Court.

## II.

Under the Fourth Amendment to the United States Constitution, in order to issue, a warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. The particularity requirement serves to "prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987) (further stating that "the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit") (footnote citing cases omitted); *see also Steele v. United States*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925) (warrant must be particular enough to enable individual conducting the search to identify the item sought); *People v. Roccaforte*, 919 P.2d 799, 803 (Colo.1996) (warrant must be "sufficiently particular that it enables the executing officer to reasonably ascertain and identify the things authorized to be seized"); *People v. Hearty*, 644 P.2d 302, 312 (Colo.1982) (the particularity requirement "prevents a general search," "curtails the issuance of search warrants on loose and vaguely stated bases in fact," and "prevents the seizure of one thing under a warrant describing another") (internal quotation marks and citation omitted).

The People contend that the warrant incorporated the affidavit, co-signed by Pridgen and Sandberg, and the affidavit cured any lack of specificity in the warrant. In particular, the People assert that the term "blood traces" in the affidavit sufficiently specified the evidence that the police officers were seeking at the time the warrant was executed and sufficiently circumscribed the search.

As an initial matter, Staton contends that the People filed this interlocutory appeal as a delaying tactic and that the evidence recovered from the green van does not comprise a substantial part of the People's case. In response, the People assert that blood stained clothing seized pursuant to the search indeed constitutes substantial evidence under C.A.R. 4.1(a). As required under C.A.R. 4.1(a), the People certified to this court that the appeal was not taken to delay the case and that the suppressed evidence was a substantial part of the proof against Staton. Staton has not raised an argument that persuades us otherwise. Therefore, we do not address this contention further.

Staton next argues that the supporting affidavit did not describe with sufficient particularity the items of property to be seized. Moreover, Staton contends that none of the testimony or other evidence presented at the suppression hearing indicates that the affidavit was attached to the warrant when the warrant was executed. Thus, Staton concludes that since the warrant was defective, it was the People's burden to prove that the warrant's defects were cured at the time of execution by showing that the affidavit accompanied the warrant.

Three issues are raised for our review in this interlocutory appeal: (1) whether the supporting affidavit of Pridgen and Sandberg was incorporated into the warrant; (2) whether the supporting affidavit had to accompany the search warrant when that warrant was executed; and (3) whether the supporting affidavit cured the deficiencies of the warrant, *i.e.*, if it met the Fourth Amendment's particularity requirement.

## A.

■ The North Carolina search warrant described only the vehicle to be searched and its whereabouts. Hence, the warrant was concededly deficient on its face because it did not delineate the evidence to be seized. *See People v. Donahue*, 750 P.2d 921, 923 (Colo. 1988) (warrant is constitutionally defective if it fails to "specify the items to be seized, and the document that did specify the items to be seized was not attached to the search warrant").

In *People v. Slusher*, 844 P.2d 1222 (Colo. App.1992), *cert. denied*, 509 U.S. 928, 113 S.Ct. 3050, 125 L.Ed.2d 735 (1993), the Colorado Court of Appeals considered whether a supporting affidavit which was attached to the warrant could cure a facially deficient

warrant. In answering affirmatively, the *Slusher* court correctly interpreted two of our prior cases, *Donahue*, 750 P.2d 921, and *People v. Drumright*, 172 Colo. 577, 475 P.2d 329 (1970), as not precluding that result. In *Donahue*, we did not consider the effect of a supporting affidavit detailing the evidence sought because that document was not attached to the defective warrant. *Donahue*, 750 P.2d at 923. Similarly, we declined to consider the same issue in *Drumright* since the supporting affidavit was not served with the warrant. *Drumright*, 172 Colo. at 580, 475 P.2d at 330. The court of appeals in *Slusher* properly concluded that, although this court found the warrants to be facially invalid in both those cases, we "specifically noted the fact that the document or affidavit which allegedly met the particularity requirement did not accompany the warrant." *Slusher*, 844 P.2d at 1227.

We now expressly hold that an affidavit can be used to satisfy the Fourth Amendment's particularity requirement if (1) a deficient warrant incorporates a curative affidavit by reference, (2) both documents are presented to the issuing magistrate or judge, and (3) the curative affidavit accompanies the warrant during the execution of the search warrant. Further, under the facts of this case, we hold that the execution of the search warrant under the supervision and control of the officer who is the affiant obviates the necessity for the affidavit to accompany the warrant when it is executed. Our holding conforms with a number of other courts that have considered this issue. *See, e.g., United States v. Towne*, 997 F.2d 537, 544 (9th Cir.1993) ("cure by affidavit" is available when two conditions are met: the warrant expressly incorporates the affidavit by reference and the affidavit accompanies or is attached to the warrant); [8] *United States v. Harris*, 903 F.2d 770, 775 (10th

Cir.1990) (affidavit attached and incorporated by reference to the warrant cured the warrant's failure to limit the search to a particular alleged violation of a criminal law); *United States v. Vaughn*, 830 F.2d 1185, 1186 (D.C.Cir.1987) (*per curiam*) (if warrant is accompanied by an affidavit which is incorporated by reference into the warrant, "the description on the face of the warrant must be read in conjunction with descriptions contained within the affidavit"); *see also* 2 Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* § 4.6(a) at 558–59 (1996). This outcome squares with the United States Supreme Court's mandate that warrants and supporting affidavits be read "in a commonsense way rather than technically." *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

Thus, there are two different time frames that are relevant for purposes of determining if the Fourth Amendment's requirements have been met: the time the warrant is presented to the issuing judicial officer and the time the warrant is executed. Here, the supporting affidavit (referred to as an "application" in the warrant) was incorporated by reference into the warrant in two different places. The warrant provided that the judge found "probable cause to believe that the property and the person described in the application and related to the commission of the crime is located *as described in the application*." (Emphasis supplied.) Further, the warrant provided that the police officers were entitled to "search the premises, vehicle, person, and other place or item *described in the application* for the property and person in question." (Emphasis supplied.) The North Carolina judge had both documents before him when he approved the application. Therefore, we conclude that the

---

8. In *United States v. Towne*, 997 F.2d 537 (9th Cir.1993), the Ninth Circuit Court of Appeals took pains to distinguish four different lines of cases that have emerged by courts agreeing with the "cure by affidavit" principle. The cases can be broken down as follows: (1) those requiring that the affidavit be physically attached to the warrant in order for the two to be construed as one; (2) those that find that an incorporated affidavit can be construed with the warrant so long as they accompany each other during the search; (3) those that find incorporation by reference alone is enough to render the incorporated description part of the warrant; and (4) those that find no specific incorporation is necessary so long as the affidavit is present during the actual search. *Towne*, 997 F.2d at 547 n. 5 (and *see* cases cited therein). These categories may reflect different fact patterns rather than actual differences in analysis.

affidavit was part of the search warrant and could cure any deficiencies thereof.

Having determined that the affidavit was incorporated into the warrant at the time the application was made, we now turn to Staton's contention that the search was illegitimate because the People failed to prove that the curative affidavit accompanied the warrant during its execution.

## B.

■ The record does not disclose if, at the time the warrant was executed, the supporting affidavit was attached to or accompanied the warrant. Moreover, the testimony elicited from Sandberg and Pridgen on this subject was ambiguous at best.[9] Nor did the trial court consider the accompaniment issue in its ruling or make the appropriate fact findings. Thus, we cannot ascertain if the second requirement, that the affidavit accompany the search warrant, was literally complied with by Sandberg and Pridgen. The People argue that Staton failed to raise the issue on his motion to suppress before the trial court and, therefore, he is precluded from raising it on the People's interlocutory appeal.

■ We have explained that under C.A.R. 4.1, "[a] defendant ... is not entitled to interlocutory relief" to appeal a denial of a suppression motion. *People v. Weston*, 869 P.2d 1293, 1297 (Colo.1994) (footnote omitted). From this general proposition, it follows that "[a]n interlocutory appeal by the People under C.A.R. 4.1 does not normally include issues raised by the defendant." *People v. Barton*, 673 P.2d 1005, 1006 n. 1 (Colo.1984) (citing *People v. Dailey*, 639 P.2d 1068, 1076 n. 8 (Colo.1982)); *see also People v. Griffin*, 727 P.2d 55, 57 n. 4 (Colo.1986) (refusing to consider the defendant's alternate ground for suppression because trial court decided the issue in favor of the prosecution and thus, court was "without jurisdiction to consider the issue on an interlocutory

appeal pursuant to C.A.R. 4.1."). The People are correct in asserting that to preserve the accompaniment issue, Staton must have stated it initially as a ground for his motion to suppress. *See People v. Jansen*, 713 P.2d 907, 912 n. 8 (Colo.1986) (a defendant's motion to suppress "should state with reasonable specificity the legal grounds upon which the motions are based" in order to "put the prosecution on notice of the contentions it must be prepared to meet at a suppression hearing and to inform the court of the issues to be decided").

Staton did not directly raise the issue of accompaniment in his motion to suppress. However, during oral argument on the motion, after both Pridgen and Sandberg had testified, defense counsel argued that accompaniment was encompassed in Staton's assertion that the scope of the warrant was impermissibly broad. The trial court was not persuaded by the argument, stating that it had "never heard overbreadth relate to the requirement of leaving the affidavit at the scene," "overbreadth and exploratory ... relates to what's requested and what is done and not the proper steps and procedures in the execution of the warrant," and general reference to overbreadth and exploratory is "not sufficient to put the prosecution, let alone the Court, on notice of that being an issue." Nevertheless, the prosecution sought additional time to brief the argument which was granted by the trial court. No additional information is available in the record before the court as to what ensued.

Because of our disposition of this issue, however, we do not need to resolve whether the issue was properly raised by Staton. Although, as a general rule, the curative affidavit must accompany the warrant during the search so that the executing officers are aware of the proper parameters of their search, we find that Sandberg's presence and supervision of the search supplants this requirement and renders the search valid regardless of the presence of the curative af-

---

9. For example, Pridgen testified that: "the search warrant was served"; the officers "took the search warrant" and went inside the van and "[i]t was executed"; and "the whole thing [referring to the warrant and affidavit] is a search warrant." Even less was said about the warrant

by Sandberg, who testified that he gave a copy of the warrant return to Staton's attorney during Staton's court appearance the day after the search and that "there was a copy of the warrant left at the scene in the van as well."

fidavit. Therefore, for purposes of this opinion, we also do not need to determine whether Sandberg had the curative affidavit in hand at the time the search took place.

The Court of Appeals for the District of Columbia was presented with a similar factual scenario in *United States v. Dale,* 991 F.2d 819 (D.C.Cir.), *cert. denied,* 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993), and *cert. denied sub nom., Ashton v. United States,* 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). In *Dale,* the lower court failed to make a factual finding whether the warrant was accompanied by the curative affidavit during its execution. While acknowledging that as a requirement, the *Dale* court nevertheless permitted the seizure since the evidence indicated that:

> [The agent] who prepared the affidavit and obtained the warrant, was present at the search, oversaw the warrant's execution and guided the participating agents in seizing documents to conform the search to her understanding of the warrant's requirements. While it is not altogether clear that the affidavit accompanied the warrant at the search, we are satisfied that the precautions taken by the government sufficiently limited the discretion of the executing agents.

*Id.* at 848.[10] Other courts have ruled that the affiant's presence during the search could ameliorate a deficiency in the warrant. *See United States v. Brown,* 49 F.3d 1162, 1169 (6th Cir.) (knowledge of executing officer "is a factor which may cure any insufficiencies in the search warrant's description of the premises"), *cert. denied,* —— U.S. ——, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995); *United States v. Gahagan,* 865 F.2d 1490, 1499 (6th Cir.) ("when one of the executing officers is the affiant who describes the property to the judge, and the judge finds probable cause to search the property as described by the affiant, and the search is confined to the areas which the affiant described, then the search . . . is in compliance with the fourth amendment" even when the affidavit was not attached to the warrant during its execution), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 590 (1989).

The purpose of requiring a curative affidavit to accompany the warrant when it is executed is to assure that the scope of the search does not exceed the scope authorized by the warrant. Here, like the agent in *Dale,* Sandberg prepared the curative affidavit and supervised the North Carolina officers executing the search warrant. As the affiant, Sandberg was intimately acquainted with the case and knew the parameters of the search authorized by the issuing judge as outlined in Sandberg's affidavit. Consequently, the danger of a broad, general search was minimized. Under these narrow circumstances, we do not need to strictly adhere to the requirement that the curative affidavit accompany the warrant. We conclude that Sandberg's presence and supervision of the search renders the issue of accompaniment moot.

We now address whether the affidavit supplied the requisite particularity under the Fourth Amendment.

## C.

■ In *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 325, 99 S.Ct. 2319, 2323–24, 60 L.Ed.2d 920 (1979), the Supreme Court explained, in the context of a search for obscene materials, that a warrant cannot leave it "entirely to the discretion of the officials conducting the search to decide what items" to seize. In particular, "the search warrant must specify the objects to be seized with sufficient particularity so that nothing is left to the discretion of the officer executing the warrant." *People v. Lindholm,* 197 Colo. 270, 274, 591 P.2d 1032, 1035 (Colo.1979) (interpreting *Andresen v. Maryland,* 427

---

**10.** We acknowledge that *Dale* does not necessarily reflect the majority view in the United States Courts of Appeals. *See Towne,* 997 F.2d at 547 n. 5, discussed *supra* at n. 8. *See also United States v. Williamson,* 1 F.3d 1134, 1136 (10th Cir.1993) (while an executing officer's knowledge is a factor to be considered in curing a manifestly defective warrant, it cannot be the sole source of

information). Nevertheless, we are persuaded by the *Dale* logic. The rationale for the accompaniment requirement—*i.e.,* that the executing officers are circumscribed by the document (in this case the affidavit delineating the parameters of the search)—is not invoked under the circumstances presented in *Dale* nor those here.

U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), and *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965)); *see also People v. Schrader*, 898 P.2d 33, 36 (Colo. 1995) (sufficient particularity in the context of location enables the officer executing the warrant to "identify the place intended with reasonable effort"). Further, "[i]n determining whether a warrant is too general, the nature of the property to be seized must be considered." *Lindholm*, 197 Colo. at 275, 591 P.2d at 1035.

The relevant language of the supporting affidavit provided as follows: "There is probable cause to believe that: blood traces, as may be contained within the clothing contained within the above-described vehicle." The affidavit, as incorporated in the warrant, also provided that the police were authorized to seize "evidence which would be material in any subsequent prosecution of this crime, specifically blood traces." The trial court held that the reference to "blood traces" in the supporting affidavit did not cure the defects of the warrant as the term "blood traces" was nonspecific. Moreover, the trial court noted that Sandberg admitted that he seized items during the course of his investigation that did not evince blood traces (contraband, Summit County newspaper, and three hair samples).

We disagree with the trial court's analysis. We find that the language in the affidavit was sufficiently particular for Fourth Amendment purposes. At the time the search warrant was sought, Sandberg knew that the crime scene was bloody and knew that Staton had been picked up hitchhiking with blood on his hands. In addition, Sandberg learned that Staton had left town taking clothing and bedding with him. Thus, there was a likelihood that some or all of these items might evince blood stains. The evidence sought was tailored to Sandberg's knowledge of the crime scene as well as Staton's actions on the morning in question and thereafter. Furthermore, the search warrant and supporting affidavit provided the executing officer with sufficient detail to prevent wholesale indiscriminate rummaging.

We hold that all of the clothing items, as well as the bag and bedding, seized during the search of the van fall within the ambit of the search warrant and supporting affidavit. Although Sandberg may not have been able to detect blood stains on all of the seized clothing and bedding during the course of the search, he was justified in taking the items to determine conclusively if such stains indeed were present.

There are legitimate questions raised, however, with respect to the other items seized by Sandberg during the search of the van. We discuss separately whether those items were appropriately suppressed.

*The Contraband*

■ Under the plain view doctrine, the seized contraband, although not included within the scope of the search warrant, should not be suppressed. In *Horton v. California*, the Supreme Court held that if a search is authorized by a warrant, seizure of a non-included item is authorized under the "plain view" doctrine if its incriminating character is immediately apparent to the executing officer because there is no privacy intrusion. *Horton v. California*, 496 U.S. 128, 136–37, 142, 110 S.Ct. 2301, 2307–08, 2310–11, 110 L.Ed.2d 112 (1990); *see also United States v. Janus Indus.*, 48 F.3d 1548, 1554–55 (10th Cir.), *cert. denied*, ─── U.S. ────, 116 S.Ct. 87, 133 L.Ed.2d 44 (1995); *United States v. Van Damme*, 48 F.3d 461, 466–67 (9th Cir.1995).

Sandberg's limited testimony on the contraband was as follows:

Q: Now before we move on with that, I want to note item number 18, bag containing marijuana, drug paraphernalia. When was the marijuana and the drug paraphernalia taken?

A: It's contraband and the Sheriff's Department took it automatically because it was contraband or illegal drugs, whatever you want to call them.

Q: Those items were discovered during the course of the search looking for clothing?

A: That's correct.

We find that Sandberg's testimony indicates that the contraband was found in plain

view by officers legitimately in the van during an authorized search. Due to its *per se* incriminating nature, the contraband was appropriately seized as indicia of crime. *See Hearty*, 644 P.2d at 311 ("Given the highly incriminating character of [cocaine and narcotics paraphernalia] as contraband, there was no constitutional prohibition against their seizure under the plain view doctrine.").

*The Newspaper*

█ The plain view doctrine is equally applicable to the Summit County newspaper. Although the language relied upon by Sandberg to seize the newspaper, that he was authorized to seize "evidence which would be material in any subsequent prosecution of this crime," is too broad in scope to authorize its seizure, the newspaper on its face constitutes incriminating evidence in the context of this case. Specifically, the date of the newspaper constituted evidence that Staton was in the Summit County area during the time frame of the murder. Thus, the seizure meets the "reasonable nexus standard." *See People v. Franklin*, 640 P.2d 226, 230 (Colo. 1982) ("the officer seizing the article must have present knowledge of facts which establish a reasonable nexus between the article to be seized—whether 'mere evidence' or otherwise—and criminal behavior") (footnote omitted); *see also People v. Crawford*, 891 P.2d 255, 260 (Colo.1995) (discussing reasonable nexus in the context of a search pursuant to probable cause and exigency). In addition, the newspaper, according to Sandberg's testimony, was in plain view.[11]

*The Hair Samples*

█ As to the hair samples found on Staton's white t-shirts and on his sock, we find Sandberg's explanation, given his knowledge of the crime scene, reasonable. *See* discussion *supra* at p. 130 & n. 7. Sandberg testified at the suppression hearing that he took the hair samples "for a sample of hair comparison and blood transfer because of the

blood to the head of the victim where the blows took place and the amount of blood in the hair." Moreover, the hair samples were found on Staton's clothing, items that the police were authorized to seize because they could potentially contain traces of blood. These seizures also fall within the four corners of the search warrant and supporting affidavit.

III.

For the foregoing reasons, we reverse the order of the trial court suppressing all of the evidence seized from Staton's green Chevrolet van on the basis that the search warrant and attached affidavit failed to meet the particularity requirement of the Fourth Amendment.

█

11. Sandberg's testimony regarding the newspaper was as follows:
    [T]he newspaper was discovered by itself, I believe. I can't remember if it was in the bag or not, but it was in the front of the van. I believe it was near the console to the best of my recollection, somewhere near the driver's seat, somewhere there in the front.
    When questioned if the newspaper was visible from the exterior of the van looking into the van, Sandberg responded affirmatively.